We have, once again, the case of the National Resources Defense Council v. Donald G. Winter, Secretary of the Navy. Council, don't pay too much attention to the time limit. I think if we go 30 minutes aside, that probably won't be too much, but it's not necessary. You can think of it as 20 to 30. Go ahead, Council, for the appellants. We have Judge Fletcher with us by telephone, teleconference, as I'm sure you all know. Welcome, Judge Fletcher. Thank you. Oh, yes. Thank you, Your Honors. Understanding the admonition there, if I could reserve five minutes, and I don't know whether you want to take that off of the 20 or the 30, but I would. Depends on how long you go.  Well, I'll ask to reserve five minutes for rebuttal. Ronald Tempest for the United States, Your Honors. The United States believes in this case that the district court committed a couple of errors that were fundamental. First, it failed to recognize that the Navy's decision, its acceptance of the alternative arrangements, constituted a new decision, which in turn called for a new legal analysis that bears both on whether certain of the claims brought by the plaintiffs were rendered moot and also undermined its analysis of the level of deference to CEQ as promulgator of the NEPA regulations and the Navy and the President in their roles in determining the significance of the Naval training. Now, you argued if it's moot, then we lack jurisdiction. Is that what your argument is? Yes. If the decision is not properly arrived at, however, or there is some question as to whether it was properly arrived at, in that I understand that the only information given to CEQ was that presented by the Navy and not presented by the opposition. Is that correct? I don't think that quite characterizes it correctly. First of all, obviously, the President always is going to have a broader perspective and broader base of information to act from than from the court. I'll limit it for the moment to the issue of the CEQ, not to the Coastal Commission. Not to the CZMA? Yes. Okay. Well, with respect to CEQ, again, I think that doesn't quite characterize it correctly. For example, the CEQ had at the point of its action the benefit of all of the after-action reports that extended up through the most recent action. It had the benefit of NIMS' new analysis as to how it assessed the risk to coastal species. Those are just two examples. Which was the second? NIMS? Yes. I'm sorry, the National Marine Fisheries Service. There was attached to the materials provided to CEQ, and it is part of the record here, a document in which reflects that CEQ, before making its determination here, consulted with that group as the expert agency. And NIMS undertook an analysis and reiterated its conclusion that it thought that the alternative arrangements would be effective in minimizing impacts and that the exercises contemplated here, just throughout the balance of this year, would not present any species risk of significance to the various species involved. But there was a full court record, including the material introduced by the other side in this litigation. That's what the district court took into account, both sides' evidence that they had submitted. And the CEQ was not presented with the evidence that was before the court, and particularly the evidence submitted by the NRDC. I think that's correct. It was not given a record that represented all of the documents that were before the district court. No, I think that is correct. On the other hand, CEQ did consult with both the Navy and with NIMS. It was able to ask what questions it thought necessary to reach its conclusion about whether emergency circumstances were present and was satisfied that it had received the information it thought necessary to reaching that conclusion. And the agency is entitled to some level of deference about what it is necessary for the agency to have to exercise its expert judgment. And that is what occurred here.  Let me ask you, counsel, the regulations which CEQ adopted at the time of Katrina or shortly thereafter, said that you could have emergency action when there was not time enough to go for a regular EIS. Now, how long did the Navy have to do an EIS? Well, the Navy contemplated these exercises beginning in the 2006 timeframe. It promulgated the EA in early 2007, and so... But who would be here with you, counsel, if the Navy had done an EIS? Well, it's not clear, because the district court might have been unhappy with the quality of that. Let's say that you then asked the EIS to engage you. That is correct, but it's also the case here that if the court takes that approach and simply... The consequences of that approach are really quite significant. If the court adopts the approach that every time an agency simply gets it wrong in its judgment about whether an EA or an EIS is required, then that has quite dramatic implications for when and how an emergency could be declared. I mean, that would essentially be saying, in this circumstance, the agency may have gotten it wrong. We believe they got it right, but except the district court's finding that an EIS, that the EA is not sufficient, you are essentially then going to indicate that the professional sailors, the chief of naval operations of the Navy, forfeits his capacity to determine what level of training, in light of the threat this president is necessary to protect them. It's not a substantive question, it's a procedural question. The question is, Judge Fletcher's question, as I understand it, is if you don't... If you had time to get an EIS and you didn't, do you then comply with the emergency requirement? It has nothing to do with the substance of judgment. And I think Judge Nelson's question went to whether if you make an arbitrary and capricious decision based only on one side when the other side's always a complete record that you don't look at. And I don't know what the answer to either of those questions is, but they're both procedural questions. Judge Nelson's was, does that make it an arbitrary and capricious decision? No one is talking at the moment about whether substantively the chief of naval operations can make out a case for doing without the normal EIS if the procedures are properly followed. Well, we don't believe it would make CEQ's determination arbitrary and capricious simply because it didn't consider a record identical to the record that the district court put before it. Certainly, there are many occasions where an agency may have had the capacity to consider additional information or to have other information put before it. But that doesn't mean that the decision it makes on the record it has becomes arbitrary and capricious. And so I think there's substantial difficulty in just linking the two, saying the fact that CEQ didn't have the same record necessarily renders it an arbitrary and capricious decision. Well, then maybe you could tell us, since it was almost two years to make an EIS and went ahead without it, what exactly was the additional information that made it an emergency? Well, let me first say, there is an EIS going on. Indeed, but it's not completed just yet and it's not expected. Or if you took the stance that with the new CEQ that the EIS is not relevant anymore, are you suggesting that, that an EIS is no longer necessary? We are saying an EIS would be one way in which to satisfy the requirements of NEPA for these exercises. But the statute and the regs have always contemplated there are other options. For example here, it is possible, the Navy is not pursuing that possibility, but it is possible that the EA having been found deficient, there might have been a way to go back and change the EA to further address this and convince the district court, no, the original finding was appropriate. They've chosen yet a third possibility here, which has always been within the statute and the regulatory allowances, another prong, which is to approach CEQ and say, we are going to respect the conclusion the district court has communicated, that it appears that there are going to be significant impacts from this. We've received that. We are now in a posture where we have an EIS going on that will cover these kinds of activities and much broader range of activities anywhere in SoCal, but we can't get that done by the time these exercises must go forward. And so I think that addresses your question of what constitutes the emergency. It's a combination of factors. It is the time necessary at this point to complete the EIS for the whole of the range, the military necessities of having adequately trained sailors and Marines who can deploy on a regular basis, the need of the chief of naval operations who is building a schedule that is forward-looking and that depends on certified trained sailors and Marines being able to deploy on a timely schedule, him having the confidence both that the training will be good for its purposes and that those folks will be available at the time necessary. Putting all of those together and the fact that the training conditions imposed place great risk on both the adequacy of the training and the adequacy of having timely certified troops that constitutes the emergency. It is not a single action or a single fact. It's a combination of importance of the actions, time necessary to otherwise complete an EIS, and time within which the actions need to occur, that is, the training and deployment of troops. And that has changed since 2005. Go ahead, Judge Fletcher. So let's turn our attention to the conditions that are imposed in the injunction. As I understand it, your opposition is to two particular restraints. One, the 2,000-meter byway, and the other is the long-service ducting conditions, when the mace must shut down. As part of your argument, you talk about a critical point at which you shouldn't have to shut down. Can you explain to us what a definition of a critical point is as far as consideration? Well, I think there's not a fixed definition to that because that is something that the naval officers identify based on their experience. But as a general matter, the notion here is, with respect to these training exercises, they are trying to bring together folks who have not previously been together. So a ship that may have been in one location, another ship in another location, a carrier wing, for example, the actual pilots having been training at some land base, but now coming together to meet with the actual ship from which they will be deployed once they are in active combat situations. The training is designed to bring those elements together and to set them with sort of multiple real-world problems. So at one time, for example, if it's a carrier training, the carrier commander will be told, imagine now that you have just lost a pilot down in this area of the training range. You need to get there for that. At the same time, there are going to be enemy ships and submarines attempting to successfully conclude an attack. And so you are trying to bring all of these things together, not just detecting a sub, not just a rescue operation, but all of these elements in a single place. In that connection, an exercise, it can be the case in these exercises, as reflected in the affidavits, you may be engaged at a point where you have detected a submarine. You broadly know it's out there, but you don't yet have a range, you don't have a very close bearing on it. And so part of what is going on there is a very great effort to locate, identify, and at the end perhaps provide a chute solution, proving that you could get to where the sub was and you could push the button and you would have been able to kill that sub. That can go on for two or three days. Go ahead. That process can go on for several days. Say you're right about at the moment where you've located it. The critical moment includes three days or more? It could, or it could be that moment where you have about gotten your chute solution and a whale pops up and you suddenly have to turn off the sonar. And that sub slips away and you have lost two or three days of work. And depending where that comes in the schedule of the training exercise. Which could happen even under the Navy's plan if the whale popped up close enough. It could happen. Certainly we would acknowledge that this is, there are levels of degree here. If a whale pops up unexpectedly inside 200, yes, they would be presented with the same possibility. But recognize that there are a couple other things going on here. There is a phase shutdown before you get to that point. And it is at the end of the day, I think the Naval officers who have been through this for 20-some, 30-some years in the case of the CNO, who have a sense of that. Now there's also a little bit of statistical evidence about how this is going to change things. The record reflects that in the eight exercises for which there's data, there have been seven occasions where there's been required to be a shutdown operating on the 200, 500, or 1,000. The data reflects... Were those critical points? No, we would say no because at the end of the day in each of those exercises, the CNO believed that whatever had happened there had not so fundamentally undermined the training and that he could, that he was prevented from certifying these troops, these sailors and marines as able to be deployed. The data also shows that that number of required shutdowns will go from seven to 35 over those eight exercises if you expand from 200 to the 2,000 meters or the 2,200 yards. That is, there were 37 times in those eight exercises where this happened. And I'm sure Council will make the point that some of those 37, the officer voluntarily shut down even where he didn't have to. But what the data also shows is that in 19 of those occasions where a whale basically popped up between the 200 and the 2,000 and sonar was operating, the commanding officer made a judgment that we need to keep the sonar on. And so he may have done one of several things. He may have powered down. He may have diverted course. He may have put those together in combination. And so you've got at least, you know, judging just based on this sort of anecdotal data, you're going to go one and a half times additional in the exercise where you have a required shutdown. And that should give you some feel for the significance of this. You should also understand these are lumpy in the sense that it's not one and a half times. It's one of the exercises of that 19 that I referred to. This happened six times in six days, six-day span, where a whale popped up or a mammal popped up inside the 2,000 and the officer in command made a judgment, we're at a point in the exercise here where I'm not going to, you know, exercise my discretion to shut down. I'm going to keep this going in order to allow the exercise to proceed. Well, let me go back to Judge Fletcher's question then, assuming without deciding. We've granted your request to mitigate some of these requirements and we defined it mitigate at a critical point. Are we saying then it's just up to whatever the commanding officer believes to be critical without any definition of meters or yards? We've thought about that and I think it's very hard, given the variety of factors that are in play in these exercises and the complexity of it, to be able to define it in yardage because it has all to do with what is going on at that moment in the exercise, what is the threat and the task that the commanding officer has been given, and what is the need for sonar as a result in order to both deal with the potential threat while accomplishing the assigned task. And the task, as I say, might be a rescue operation, it might be get to X point and launch a flight of fighters to simulate as if they were going on a bombing run from a certain point. Why do you need sonar to simulate a flight somewhere? Because what these exercises are designed to do is not simply teach you how to use sonar, but how do you use sonar and protect yourself at the same time you're doing, for example, more affirmative things. So the exercise might involve a command partway through the exercise to the carry group commander, we need you to get to X point defined in the training area and we need you to launch a squadron at that point. If the commander starts steaming off that way and one of the subs that is playing defense is in his way and creates a kill situation for the sub, that is a failure of the exercise, that's a failure of the commander. So these exercises are designed to bring together all of these things that you might separately otherwise be training for. You might separately in some situation teach pilots how to land and take off a carrier. It sounds to me like you'd never have a critical moment. Oh, no, I think to the contrary, because in my example, I give you that example, the commander has been told get to a particular point, launch your jets from that point, have them do a simulated bombing run into a desert, you know, a range location that's in Nevada or something, and then retrieve them. Yes, so you'd want to know whether there's an enemy submarine approaching. Correct. And he's sitting there. So what would be a non-critical moment? Because in your brief, you certainly distinguish between the critical and non-critical, and you say that the commanders have voluntarily sat down a fair number of times when there are non-critical moments. Well, there are also other moments in the exercise where folks may be doing one-on-one exercises. It may be because there are, I mean, these go on for three weeks, and so it's a mix of things going on. There may be other moments in the exercise where it's a single ship and a sub sort of put in what they call a limited play area, and they say, go at it, each other, and that's designed to focus just on that capacity. There may be other moments where all that they're being asked to do is demonstrate that you can extend ordnance, that you can shell, that you can launch a missile correctly without this additional defensive element being layered on top of it. The exercises are designed to do all of these things, to have different building blocks in them, and the exercises adapt as they go forward. In the second of the two kind of exercise, not the Comp 2X, but the JTFX, for example, that will be a little shorter. It could be the case that they essentially put the two forces into a box area to do their training, and sort of the attackers end up at one end of the sort of range sailing about, and the carrier or the expeditionary group ends up at the other, and they're simply not engaging each other. What happens at that point is the person who's running the exercise intervenes and gives them something to do that is likely to bring them together and to force this overlay of accomplish an affirmative mission while also defending against the threat. And so it has this interactive quality to it that is designed to force by the end of the exercise a demonstration that this collection of ships can work together in a successful way both to accomplish affirmative objectives but also while defending. Let me ask about another aspect of the injunction. The second one you complained about is the surface ducting condition, and together state that if you can't operate without restrictions during surface ducting conditions, you wouldn't be able to certify the fleet or the task force. I also have the impression that in 2006 there were no incidents of surface ducting conditions. Were you able to certify that fleet? Yes. I think it is not that you absolutely could never have an exercise without surface ducting that results in certification. It's sort of two other points. One, if you have surface ducting there, that introduces something into the exercise that needs to be treated realistically because in the real world, subs that have surface ducting advantage, you've got a ship coming along here where the sub wants to be is sort of right here where the sonar comes off, hits the surface duct, and angles out. That's not really answering the question of whether you can certify and in fact have certified when the fleet gets no training under surface ducting conditions. It is possible to certify where they were not. It's not possible. You have certified in 2006 when the fleet did not get any surface ducting conditions training at all. Well, I think 2006 you're referring to a different set of exercises where certification occurs for a different purpose if you're referring to RIMPAC. I mean, those are different exercises, different purposes. But I think, yes, we would concede that these training exercises will not always include a surface ducting element. On the other hand, when surface ducting is present, it's important to take advantage of that. But it doesn't make them unqualified to be certified or to fight the war if no surface ducting conditions occur, which is not unusual. Well, it could if in the CNO's judgment the net sum of everything that they had been able to otherwise accomplish left them the lack of surface ducting sort of put it over the edge. As, again, I say the CNO's judgment at the end rests on his evaluation of the sum total of what was accomplished during the exercises, the skill sets that were demonstrated. It's hard to believe, reading your briefs and affidavits, about how essential it is to have this fleet where you want to send it and how essential it is to have those troops there that you wouldn't certify them and you'd keep them home and leave the area undefended because there were no surface ducting conditions. Well, those are two different things. I mean, you might not leave the area undefended. I mean, in a really extreme, you will do things like extend out tours of duty for those who are already present on that location. You will attempt to accelerate training for some other group that was otherwise in the queue to be deployed. And so you may not certify, but that's exactly, I think, part of the point here, is that from the CNO's perspective where he has to be looking out at the fact that it's, you know, a year-long, 18-month-long process to get one of these fleets out there. You bring them back. They are down for repairs for 10 months. Then you start building them back up. You start building the individual components. And then at the end, you bring all these ships together in this final set of exercises. The prospect of having one of them, those exercises, be inadequate for the purpose because surface ducting was present and you couldn't tell whether the fleet got through the exercise because it knew how to handle surface ducting or it was just sort of fortuity is a real problem from the perspective of the Chief of Naval Operations. Can I ask you a question? Go ahead. I wanted to ask another question about surface ducting. How does the definition of significant surface ducting conditions in the January 10th order compare with the definition of strong surface ducting conditions used during the 2006 Rim of the Pacific exercise? I think they're meant to be about the same. A little bit of ‑‑ I think we've all pretty well settled now on the notion that significant surface ducting is meant to ‑‑ I think that we need to agree that they are comparable. I just wanted to make that clear. Yeah, I think that's generally where we've gotten to here. Thank you. All right. You wanted to say five minutes? I did, but I see I've gone well beyond. All right. We'll give you five minutes. Thank you. Counsel for Pelley's. Good afternoon, Your Honors. I'm Jamie Jordan Patterson, Supervising Deputy Attorney General on behalf of the California Coastal Commission. We're here to support NRDC. I'd like to leave the lion's share of the argument to my co‑counsel, Mr. Kendall, but I did want to make just a couple of observations, if I may. One, the commission believes that this is not an all or nothing situation. The commission believes that the Navy can train using sonar in a way that protects marine mammals. We think this is evidenced, as counsel anticipated, in the after‑action reports that the Navy filed and that are in Exhibit 16 to the Navy's exhibits. The commission, when it considered this in January of 2007, found that a 2,000‑meter safety zone was appropriate based on the received sound levels of marine mammals. It found that this was particularly appropriate because the studies that the commission had before it involved marine mammals in the wild as opposed to marine mammals in captivity. The Navy's reports that it relied upon were primarily studies involving marine mammals in captivity, which may have a different response to adverse sonar and sound levels than animals in the wild might. Based on that, the commission believes that the safety measure adopted by the district court in its modified colonial injunction is an appropriate level. It allows the Navy to train. The interesting thing is the district court did not adopt all of the mitigation measures that the commission had found to be appropriate, nor did it adopt all of the mitigation measures urged by NRDC. Nevertheless, we believe that the mitigation measures imposed do adequately protect marine mammals. I wonder about the Navy's argument that, say, the 2,200‑yard or 2,000‑meter shutdown imposes a significant hardship on the Navy if the shutdown occurs at a critical point. First of all, can you define what a critical point might be? I am not as familiar with the Navy's procedures. My understanding was that it was at a point where the success of their training exercise was called into question. I believe that there is some evidence in the record that indicates there are distances at which the Navy has difficulty spotting a sub. However, we think that that is because they have to shut down the sonar sooner. The way it works is as the whale comes towards the sound, under the commission and the district court's analysis or condition, you would have to shut it down when the whale is sighted at 2,000 meters because that is at the level that there is a potential for adverse impacts on the whale. As the whale comes closer, the sound is more amplified. It is louder to the whale. That is why we felt that it is appropriate to shut it down when the whale is farther out so the whale is exposed to a lower level of sound. I was trying to get at the question of if we took that they should have discretion at the critical point, would that be the discretion of the commanding officer, not bound by any meets and bounds or meters? It is difficult to say, Your Honor, because as COUNCIL did acknowledge, they have shut down voluntarily at distances up to 6,000 yards. They shut down at 2,000 yards, 4,000 yards, 6,000 yards as indicated in the after-action reports. That was voluntary. We don't know why. The after-action reports are very sketchy. They don't explain what the circumstances were. We don't know why they shut down there but then refused to shut down at other times. It may be that it is information that is not available to the public, but it is certainly not included in the after-action reports that were provided to the court. Thank you. Just very briefly, we did argue in our brief that we believe under the Federal Coastal Zone Management Act the presidential exemption order raises violation of separation of powers concerns, but the district court based her decision primarily on the NEPA exemption, and we believe that was properly founded as well. With that, I'd like to turn it over to Mr. Kendall. Thank you. Thank you. Good afternoon, Your Honors, and may it please the Court. After this Court entered the order in November, the district court was asked with its longstanding involvement in this matter and its familiarity with the effectiveness and the practicability of the available mitigation measures to impose a tailored injunction, and that's what the district court has done. The district court reviewed thousands of pages of evidence. The court visited a destroyer to see sonar in action and wrote a lengthy opinion that analyzed the evidence in quite a bit of depth. The appellant's response to that was to try to escape this injunction by seeking refuge outside the judicial system. The district court, in responding to that, again at this Court's direction, did not abuse her discretion in first reaffirming the tailored injunction and again restating the reasons why that was an appropriate balancing of the different stakeholder interests here, and I'm going to spend some time talking about that. And the Court was also quite correct in saying that the CEQ action could not be squared with the regulation itself on which CEQ relied, could not be squared with the statute, which gives the CEQ whatever authority it has, and could not be squared with the Constitution. I'd like to ask you a question about the validity of the CEQ. If this Court were to withhold judgment on the validity of the CEQ and the presidential actions, would this case be moot? Well, the case would not be moot, but I don't think it's possible for the Court to withhold judgment as to whether the CEQ action compels the district court to vacate the injunction. Put the question slightly differently. For a preliminary injunction where the test is do you raise a substantial issue or are you likely to prevail on the merits of an issue? Is this one of the issues to which we can apply either of those tests? It's a very interesting point. If I can restate it just to make sure that I'm understanding it, is the question whether since we're at a preliminary injunction level, it's not necessary for the Court to resolve the validity of the CEQ action today because an injunction would be appropriate even with the CEQ input? No, that's not the question. The question is we have issues on the merits of the case  whether your side has a substantial likelihood of succeeding on the legal issues. We don't have to resolve the legal issues in general. You can prevail if you have a substantial likelihood of or if you've raised a serious legal issue under another preliminary injunction test. The question is, is this issue of the CEQ's, the validity of the CEQ's order, is that subject to the same test on a preliminary injunction or do we have to decide the merits of that issue in distinction with the merits of the other legal issues in the case? We think the former. As we've stated the standard of review in our brief, what we meant to convey is that the standard of review here is the traditional abuse of discretion standard of review in which this court must analyze whether the district court abused its discretion. Now you go to the second level of, well, what was the exercise of discretion? The exercise of discretion was exactly the factors that Your Honor mentioned. And then you, I think, in that context, would say that if we are likely to succeed on the merits of our argument that the CEQ could not trump the district court's injunction, even if you might have some doubts as to whether that's true under the standard of review, you'd be required to affirm the injunction. Of course, we think there's no doubt that the CEQ's actions are invalid. But we would not have to say that. You would not have to say that. That's quite correct. Now, let me start, if I can, by discussing why we believe this injunction was not an abuse of discretion. Can I ask you one question that's basic, at least to me, on this case? How do you get around on the balance of the hardships? How do you get around the affidavit of the chief of naval operations and the other admirals who say, in essence, we would be seriously jeopardizing the national security, and more specifically, that there would be an unacceptable risk that they would be unable to certify the ship or certify the task force or certify that the Navy and Marine personnel have been properly trained? Can we disagree with that, or do we have to disagree with it? How do you overcome those affidavits? The question, of course, is whether the district court was within her discretion in disagreeing with it, and here's why the district court was within her discretion. The best evidence of the Navy's ability to train is not the declarations that have been submitted in support of their litigation position, but the record that they made before they were litigated. The facts are that the Navy is able to train and has trained and is able to certify and has certified under the strictures, although sometimes voluntarily under those strictures, that the district court has imposed. So, for example, to start with surface ducting, which is the subject of some questions by Your Honor, as Your Honor pointed out, the Navy has certified its ships despite the complete absence of surface ducting conditions in all of the SoCal exercises that had been conducted where we have these after-action reports. And in the record, this is at Navy's Exhibit 16, Attachment B at Pages 5 and 11, Attachment C at Pages 10 and 15, Attachment D at 7 and 12, and Attachment E at 8 and 13. So they have been training and they have been certifying despite an absence of this particular element. And then also, the district court took into consideration that in the RIMPAC exercise, the Navy agreed to a power-down procedure with respect to surface ducting. So they are able to do their jobs. And this is an important measure because these surface ducting conditions substantially increase the risks to the marine mammals in the area because of the increased efficiency of the sound propagation and thus received levels of sound are higher. Now, what the district court did here was impose a suite of measures. Keep in mind that we were asking for both safety zone and power-downs in the circumstances such as we asked for and obtained in RIMPAC, plus geographic restrictions. From our point of view, as we've argued in this court and we've argued in the district court, the very best mitigation is to go to places where you don't have a lot of marine mammals, to stay away from the coastline, to stay away from the seamounts like the Cortez and Tanner Banks that you heard the Coastal Commission had wanted them to stay away from. But the Navy took the position that to redline them out of certain geographical areas would create training problems because they need to look for submarines hiding in the coastal areas. They need that symmetry of the coastal area and so that's why they were insistent that they didn't want the geographic restrictions. So the district court was confronted with a problem. And the solution to the problem that the district court chose was to use precisely the means that the Navy itself agreed and has used in the past. And those means are safety zones with shutdown and power-downs in order to reduce the danger when you're in an area that is full of marine mammals. You know, we wouldn't have the Army training in downtown Los Angeles with live ammunition. It's a lot more dangerous to be training when there are a lot of marine mammals right near you than it is if you go somewhere where there are not. But if you're going to be in the area where you know the marine mammals are predicted to be and with the science, the Navy's own science predicting serious harms to these marine mammals if they are within the distances that the district court was concerned about, you need to take these precautions. So now to focus on the 2200-yard safety zone, this whole discussion of critical and non-critical is very interesting. I want to spend a few minutes talking about this because I know it's something that's concerning the court. The evidence, first of all, in the record, which is where I think this whole discussion in the Navy's brief came from as an explanation for how they can account for this evidence. Here's what the evidence shows. If the 2200-yard safety zone had been applied in the Navy's eight recent SoCal exercises, sonar shutdown would have happened on average only one to two additional times per exercise. That's it. Given the brief duration of shutdowns and the extent of the sonar use during these exercises, which is about 100 hours on average of sonar use for each exercise, the additional shutdown events over all of these exercises would have affected less than half of 1% of the sonar use hours. The Navy wants to make an argument, and I, of course, can't read all of the declarations that you see, despite the fact that I was probably cleared to a higher level than most of these people when I was in the Justice Department. They will not allow me to get cleared for this case. I submit that there's a fair amount of tactical use of classified declarations going on here. The Navy claims that the district court's shutdown zone would result in five times the number of shutdowns, and that is on that basis that all of their arguments in these classified declarations proceed. But this fails to account for the fact that they have a practice, a frequent practice of shutting or powering down the sonar in the vast majority of cases whenever marine mammals were sighted at any distance. They are already shutting down far more often than their preferred 200-yard safety zone would require, and despite all of these shutdowns, there's no dispute that the Navy's been certifying its ships and training its sailors. So this is what's in the record. This is the hard fact. So what do they do to try to avoid the significance of that fact? They say, without any evidence in the record to support this, because if you look at the after-action reports, they don't differentiate between critical and non-critical times, which is why it's so puzzling for the court to try to sort that out. They say, well, when it was shut down voluntarily, it must have been non-critical. But there's no evidence in the record to support that. The evidence that is in the record is that the Navy has trained with the shutdown and power-down mitigation measure over and over again, and as Judge Reinhart, you pointed out, if they'd been shutting down, they still managed to train. And I understand the argument that they're making, that they're engaged in a war game that has a build-up, and the argument, it seems to me, reduces down to in what they do, they can't take a time-out. But I don't think that there's support in the record that they can't take a time-out. I don't think that the district judge had a level of confidence in the veracity of these mitigation declarations. When you consider that the Navy has repeatedly taken positions about its feasibility of mitigation, that when we get to see it, we are able to disprove it. There's a history of the Navy playing, I'll just say it, fast and loose with this issue of feasibility. We have pointed out in our brief that the Pacific Fleet in particular has repeatedly rejected mitigation and conservation measures on the basis that these measures might establish a bad precedent for them, that even though the measures are feasible, they don't want to do them. And there's a fair amount of evidence of their, for example, opposing a coastal exclusion that was recommended by NIMFS for RIMPAC 2006, despite the fact that they could implement that measure, because it says in the record this would establish an unacceptable precedent for all ASW exercises. That is at Supplemental Excerpt of Record 470. And there are similar instances of that cited in our brief. The district court had to consider all of this evidence, and I submit that the district court did exactly what your honors asked to have done, which is to take a difficult situation where the law in this and other circuits requires that there be an injunction to prevent the environmental harm. The district court listened very carefully to the Navy and crafted something that was designed to do the best that could be done under the circumstances to protect the environment. Now, why 2200 yards? Well, of course, from our point of view, it's not enough, because the evidence is that way past 5000 yards, you have very serious problems for marine mammals. But the record does show that after 2000 yards, the ability of sailors on the deck using binoculars, or fancy binoculars that they're using, degrades. So we've always complained about the mitigation measure of safety zone because it is not that easy to see far enough. But what the district court did was impose a safety zone that really goes to what they can see, and then added a number of monitoring measures on top of that in order to maximize the ability of the Navy to spot the whales and to stop the sonar when it would harm them. Now, it's worth noting that when they then ran to CEQ, keep in mind the Navy has never contended in this case that it is unable to train with almost all of these measures in place. It's only complaining about two of them. And yet, when they went to CEQ, they had CEQ void the entire injunction. This shows what they were really doing. What they are really doing is they are saying, it's for us to decide how we're going to mitigate and for the courts to stay out of our way. That's not the law. The courts are not obligated to give a blank check to the military when the environmental laws, or for that matter, any other laws are involved. The problem with trying to, if the court was inclined to think about this, say when they have a critical need, they can continue to use the sonar, if that's one thing the court was thinking about, is that would give them a blank check. Because it would be a standard list up to whoever the naval official would be, and they'll do what they do. And there would be no meaningful injunction in that case. What the district court tried very hard to do is come up with a bright line using the methods that the Navy has used before that everyone could live with, and it would be clear and it wouldn't be an ambiguous line to try to understand. Now, CEQ, there are many problems with what CEQ did here. First of all, it's very difficult to reconcile what CEQ found as being an emergency. If you look at the justifications that CEQ gave, CEQ is simply saying, and by the way, it has no particular expertise in the area of military operations, that the Navy can't train with these measures. Conclusory statement, nothing more. As the court pointed out, based not on seeing our evidence, and remember the way the district court got to the conclusions that the district court reached was by looking at our points as well as the Navy's points, and looking at all of the evidence here, and considering the fact that we were able to show inconsistencies in the Navy's representations. CEQ didn't consider any of that, and CEQ's definition of emergency is, there's an injunction. Well, that can't be the emergency. If the only emergency is the injunction, and that was the only one that they considered, that blows a hole in the heart of NEPA. That hole swallows the entire statute. Anytime the White House wanted to trump a court order in an environmental case, be it oil drilling, and they say that there's a national energy emergency, or what have you, that would be the excuse that they could use. And this regulation was never, ever meant for that. But further, a mountain of evidence considered by the district court shows there is no emergency. And so all CEQ is doing is disagreeing with the district court. The district court found the Navy can train with the measures that she's imposed, and CEQ says, well, we don't agree with that. That's just the executive branch reiterating its long-held position. They have said from the very beginning, we don't want these measures, we don't think these measures are good, that the courts have disagreed. It's not for CEQ to give it the label of emergency, which is completely inconsistent with the dictionary definition of emergency. There's nothing unexpected here. And at most, all they have is basically a contrary opinion. There's no deference that should be given to that opinion, any more than there is deference given, for example, in the need case to the opinion letters of customs. There's no regulatory proceeding that happened here. It wasn't public. It was ex parte in private. It had just pieces of the record. The statute is not ambiguous. The language of emergency is not susceptible of this interpretation. And there is really no basis for any deference, other than the persuasive power under Skidmore of what CEQ has to say. And frankly, if you look at their conclusionary statements, it's not nearly as persuasive as the judge's exhaustive analysis. You have, for equal time, you would have another seven and a half minutes. That doesn't mean you have to use them all. Well, what I'd like to be is helpful here, rather than just hear myself speak. There are a couple of points that came up in the reply brief, perhaps, that I should just respond to because I hadn't had a chance to do that. One of them is that the argument that's been made is that the status quo is the Navy gets to train, and we're the ones trying to change that. That absolutely stands environmental litigation on its head. The status quo here is the whales aren't being harmed, and they're the ones who want to create the possibility of harm, and it is the environmental law's duty to prevent them from doing it. So to say that the status quo is they get to keep violating the law is an absolutely preposterous statement, and if you think about the implications of it, again, you might as well just forget about any remedies in the environmental laws. The notion that they have, as they say in the reply brief, is that what the courts should do is to look at their two options, a declaration, a declaratory judgment, and an injunction, and in this case, just choose declaratory judgment. Again, think of the implications of that in environmental litigation. If that were the case, there'd be no remedy, and without a remedy, what's the point of bringing these cases? The whole point of bringing these cases is to prevent the possibility of harm from occurring, and at the preliminary injunction level, as was pointed out before, that's all we have to show, and if the case goes further to trial or summary judgment, the court will have to determine what is an appropriate permanent injunction. Now, in the facts of this particular case, by the time we get there, we will probably be pretty close to January of 2009. I think, unless the Court has any questions, I'd like to say thank you very much for, I know the Court has been on, as has all of us, a really bruising schedule in working on these matters, and I'm sure I speak for the government's full responsibility. Well, I'm going to get worse. We want to really do express our appreciation for all the enormous hard work of the Court and the Court staff. Thank you, counsel. Let me just start by echoing that directly. We understand, both for this Court and for the District Court, this has represented a substantial level of work, and we appreciate the effort the Court has put in and the way you've tried to address the various concerns we've articulated about timing. Can I ask you one question before you get to your basic argument? Are all the affidavits, other than the one we received recently, about the timing of the operations, were all those other ones before the District Court, or which other ones does the District Court not have an opportunity to consider? I think the answer is yes, everything except the one that you have gotten that addresses this question of scheduling and what led to an acceleration of a certain, I'll turn to my colleagues, they confirmed that, so I now feel confident in saying yes, the District Court would have had everything but that one. Thank you. Let me start, if I could, with the question about the balancing of the equities and the role of Navy here. One thing I think is important to bear in mind as the Court considers that question is the overall architecture here of the environmental statutes and the regime that Congress has established. What it has established is a regime that recognizes that there are going to be moments where environmental interests and other interests of the United States come into some tension. But doesn't the answer to that question really depend on what the District Court found to be the harm? The District Court found that there was no substantial harm to the Navy because it could accommodate itself to these conditions. If you agreed with that, then there'd be very little harm to the Navy and the harm would all be on the plaintiff's side. If you agreed with your version of the facts, that the national security would crumble under this injunction, then you would clearly have the balance of harms. So really, it's not really an issue of which is more important, it's a question of which set of facts you accept. Well, I think in going to that judgment, it seems to me it is still fundamental to recognize that the architecture Congress has established here with respect to the MMPA, the CZMA, is that the substantive statutes that actually provide the substantive protections for the species as opposed to calling for levels of study and advance of action. In those statutes that provide the substantive protections, Congress, at the end of the day, has consistently provided a safety valve mechanism for the President or the Secretary of Defense to make an announcement that in his or her judgment, having the full benefit of all that that person has access to, which is always going to be a fuller record than we can ever, as lawyers, manage to put in front of a judge, as best as we can try. We can never capture the full range of threats and foreign affairs and changes that the country faces. Congress has made a considered judgment that at the end of the day, it's going to provide a safety valve out through the President and the Secretary of Defense. Having done that, and the President and the Secretary of Defense having exercised that judgment in this case, I think it bears remembering, and it would be exceedingly odd to have the President's determination that these exercises are in the paramount interest of the United States to go forward in the way they are proposed here, to have the Secretary of Defense's conclusion to that, and nevertheless to conclude, no, the district court can effectively trump that judgment by imposing injunctive conditions in the name of a procedural statute. Counsel, one point that has bothered me, and I believe it bothers my co-judges, is that apparently only one side was presented to the President, and one side presented to the DQ. They did not have the benefit of the full evidence. Well, they had the benefit of all of the action reports. And they verified everything the Navy wanted to present, but they didn't have any of the evidence which suggested that the Navy could conduct its exercises appropriately with some constraints. Well, they had the benefit of the opinion from National Marine Fisheries Services that the exercises going forward in the way proposed would minimize impacts, including impacts, for example, on deep whales, and its conclusion that this would present no species-level risk. Having had the benefit of that expert judgment and the benefit of the CNO's judgment that this presented an undue risk to his ability to complete the training necessary, that is a robust record on which I don't think one can conclude CEQ acted arbitrarily and capriciously. If I could, just two quick points, realizing I'm over. One, on the question of could we define critical point, the only other thing I'd like to point out to the Court is that puts the Naval officer in the field in a very difficult position because he is out there conducting an exercise, and suddenly he is calculating not just where am I in the exercise, but what's potentially the judgment of a court or the plaintiff coming back at some later point saying, you violated the order. At risk of contempt, you are now adding that additional element, and I think that's just a great deal to ask of the officer in that circumstance, unless it's very clear that his ability to exercise that judgment is exceedingly broad and allows for very substantial room not to be second-guessed after the fact on that approach. Any limitations imposed by the Court, we said except under critical conditions, would be illusory, would they not? Because it would be the decision of that officer that it was a critical point. I don't think it would be illusory because I don't think one could presume that a Naval officer, an admiral, I mean, you're talking about who would be commanding these, would be so dismissive as to simply say, well, because it's now in my judgment, I will define everything to be a critical point. So I don't think it's illusory. So it would be an admiral who would make those decisions? The commander of these task forces, whether it's a carrier group or these marine groups, because they are composed of six or seven ships, these are admiral-level officers who are in charge of the overall exercise as it's going on. Who would decide what a critical point was? You would, I think, expect that, although there's a further complication, of course. There's a commander on a particular ship. He may be, you know, you may have an admiral on the carrier at the center with four or five protective ships around forming a dome. I'm not, I'm sorry, I can't address for the court. What would be the rank of, you know, one of those officers on one of those perimeter ships who might be making the judgment in, you know, a matter of moments? Just two other, these two other quick things. As to the Navy's concern about everything becoming precedent, well, we have heard and seen repeatedly here reference to Hawaii. So I just, there's some reason for them to be, to have that concern that every time they give any level here in an attempt to balance, that becomes the new baseline for them, regardless of whether the exercises are different locations or for different purposes. And then finally, the suggestion that somehow the exemption here would swallow NEPA. That doesn't capture our argument here, because our argument is that the emergency here resides not simply in there being, you know, a desire to undertake an action and the court having stopped it, but also the importance of that action and the associated time pressures that come with that. And CEQ and the executive certainly are not required. To some degree here, you have a disagreement between the district court about how important all of these aspects are and the executive. And it's certainly not incumbent on the executive to simply give up its view that where the balance properly lies is on the other side. And so you create a tremendous risk here and a tremendous sort of incentive actually to cause the executive in the next instance to race to the emergency. Because if the notion is here somehow, the district court having exercised its judgment first, that has to control. Well, what you create in the future then is a significant incentive. At the moment, it looks like there's any risk of an action being challenged to run to CEQ to ask for the emergency declaration. So that judgment can be in first, and that would be the one that requires the district court to defer to. That's not a good posture to be in.  And taking the position that when a court makes a decision, that's a reason for the executive to go somewhere and say, I'll get another opinion and we can ignore the decision of the court. You know, you don't expect an executive to give up his view. He may be even more determined after there's a district court decision. But you do expect an executive, if he has that view, to pursue it through the court system rather than through the executive branch. Well, respectfully as to that, the executive has respected the judgment here and the order, you know, not to train under these circumstances. But the case law shows in abundance that neither the executive nor Congress is bound to not seek a change in the legal regime or in the legal analysis simply because a district court has pronounced judgment with respect to future conditions. Well, Congress can pass a law overturning a court decision. There's no question about that, as long as it's not a constitutional decision. Congress can certainly change the law. I didn't think even a unitary executive could do that to the court. But this is not a change in law. This is an exercise of a prong that the law allows for, which is to comply with NEPA either if there are significant impacts to comply, either by getting the EIS done before the point that the action is taken or to seek alternative arrangements. That is not ignoring the law. That is not changing the law. That is simply the executive availing itself of a prong of the law that was there from the get-go. And with that, I think I should conclude and thank the court. Thank you very much. Thank you all very much for an entertaining argument. As you know, you're going to be hearing from us very shortly. We'll have a wonderful weekend. I'd like to add my comments. We hear many, many, many cases, but we don't have excellent lawyers on both sides in all of our cases, unfortunately. Today, in my opinion, we had excellent lawyers on both sides, which makes this job much more not just entertaining but much more palatable. Thank you very much. Much more difficult. Of course. Your Honor, to the degree there was excellent lawyering on this, I have to say it's pretty clear it was because I was standing on the shoulders of excellent folks who were propping me up, and I appreciate that. But the United States generally, I'll take that as a comment directed at us, and we appreciate that very much. Thank you all. We stand adjourned indefinitely.
judges: Fletcher, Nelson, Reinhardt